**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **M. KELLY TILLERY** | : | **CIVIL ACTION** |
| | : | |
| **v.** | : | |
| | : | |
| **LEONARD & SCIOLLA, LLP** | : | **NO. 05-6182** |

**MEMORANDUM AND ORDER**

Norma L. Shapiro, S.J.                                                        June 9, 2006

Plaintiff M. Kelly Tillery, Esq. ("Tillery") brought this action against the law firm

Leonard & Sciolla, LLP ("the Firm").   Tillery was once a partner of Leonard, Tillery & Davison

and Leonard, Tillery & Sciolla, LLP.  In his complaint, Tillery alleged that Leonard & Sciolla's

continued use of the domain name "leonardtillery.com" was a violation of federal and state unfair

competition and trademark law, the federal Anti-Cybersquatting Consumer Protection Act, and

42 Pa. C.S.A. § 8316 (prohibiting the unauthorized use for commercial purposes of a

commercially valuable name and likeness).  He also alleged that the Firm violated federal false

advertising law by listing on its web site matters on which no lawyer currently at the Firm has

worked or would be qualified to work.

Several months after filing the complaint, Tillery filed a motion for a preliminary

injunction.  The requested injunction would have ordered the Firm to disable the web site found

at "www.leonardtillery.com" and enjoined the Firm, among other things, from using any

variation of Tillery's name in connection with offering or providing legal services, or otherwise

acting in such a way as to cause potential clients to believe Tillery is associated with the Firm or

1

sponsors or provides any of its services.

The preliminary injunction will be denied because Tillery has not established that he is likely to succeed on the merits of his claim; the balance of the harms does not favor Tillery; and the public interest is not served by an injunction.

## I. FACTUAL BACKGROUND

Tillery is a well known intellectual property attorney.  3/23/06 Tr. at 39.  He graduated from law school in 1979 and in 1982 became a partner in the law firm of Leonard, Tillery & Davison.  Subsequently the firm changed its name to Leonard, Tillery and Sciolla, L.L.P. 3/23/06 Tr. at at 25.   Tillery now practices intellectual property law as a partner at a different law firm.  Defendant Firm has been known as Leonard & Sciolla, LLP, since Tillery's departure in May, 2005, and is a regional firm with a number of practice areas, including intellectual property law.

The Leonard, Tillery & Davison partnership was established in 1982.  The Partnership Agreement provided, among other things:

Section 7.6      Firm Name

The remaining or surviving partners may continue to use the surname of a withdrawn, retired or deceased partner unless the use is deemed to be a violation of the Code of Professional Responsibility or the withdrawn or expelled partner continues to practice law.  The remaining partners shall have the right to continue the business of the firm by themselves or in conjunction with other persons.

Ex. P-1.

In July, 1998, Leonard, Tillery & Sciolla, LLP, registered the internet domain name

"leonardtillery.com,"[1] published a web site at the internet address "www.leonardtillery.com," and provided its employees with email addresses ending with "@leonardtillery.com."

About April 15, 2005, Tillery informed his partners of his resignation from Leonard, Tillery & Sciolla, LLP.  The partners agreed the resignation would be effective on April 30, 2005.  3/23/06 Tr. at 88-89.  About May 1, 2005, the Firm changed its name to Leonard & Sciolla, LLP.  The Firm's staff was instructed that it was "impermissible to use the LTS [Leonard, Tillery & Sciolla] logo on letterheads, labels or envelopes (or anything else for that matter)."  Ex. D-8.  New letterhead, marketing materials, and business cards with the new firm name were produced.  Exs. D-9-D-13, D-15, ; 3/23/06 Tr. at 93-94.  The Firm advertised its change of name in the *Legal Intelligencer*, a regional trade newspaper, for two days.  3/27/06 Tr. at 33.  The Firm also sent notices announcing the new firm name in April, 2005.  3/23/06 Tr. at 88-89; Ex. D-14.

About one week before Tillery's departure, the Firm also registered a new domain name, "leonardsciolla.com," and thereafter made its web site accessible through the address "www.leonardsciolla.com."  3/23/06 Tr. at 66; Ex. P-17.  The web site itself was edited shortly after Tillery's departure to reflect the new Firm logo (without Tillery's name) and to eliminate the link to Tillery's photograph and biography.  3/23/06 Tr. at 94-95.  The Firm did not cancel the registration of the domain name "leonardtillery.com" or completely disable the internet address "www.leonardtillery.com."  Rather, at the time Tillery moved for a preliminary

---

[1] "A domain name is a way to identify and locate computers and resources connected to the Internet. . . . It tells users where to find a particular web page, much like a street address or phone number tells people where to find a particular home or business.  No two organizations can have the same domain name."  *Strick Corp. v. Strickland*, 162 F.Supp.2d 372 (E.D. Pa.,2001) (internal citations omitted.)

injunction, users reaching the address "www.leonardtillery.com" were "seamlessly directed to the Firm's web site at www.leonardsciolla.com . . . ."  Def.'s Answer to Prelim. Inj. Mot. ¶ 20.

Although the name "Tillery" is not immediately visible to ordinary viewers of the new web site (except in the context of old press releases archived on the site), the name "Tillery" appears once in the computer "source code" of the home page as part of the phrase "Leonard Tillery & Sciolla locations."  Exs. P-16, P-17.  Tillery testified that the word "Tillery" in the source code would cause a search engine such as Google to find the Firm's web page during a search for "Tillery."  3/23/06 Tr. at 32-33.  At the evidentiary hearing on the motion for a preliminary injunction, Tillery also introduced evidence that Google searches for "M. Kelly Tillery" and "Kelly Tillery" found a cached web page with the new "Leonard & Sciolla" logo and Tillery's photograph and biography.  Exs. P-2 & P-3.  The link to that page was accompanied by this warning: "Google's cache is the snapshot that we took of the page as we crawled the web. The page may have changed since that time."  Ex. P-3.  Hugh Hutchinson, Esq., a partner at the Firm acting as its counsel in this litigation, stated that the Firm had corrected the problem as soon as it was brought to its attention by deleting the inactive page found by the Google searches. 3/23/06 Tr. at 7-8.  John Leonard, Esq., another partner in the Firm, confirmed this in his testimony.  *Id.* at 94-95.

After Tillery's departure, the Firm also retained the email addresses ending "@leonardtillery.com" and also created new addresses ending "@leonardsciolla.com." Generally, mail sent to the "leonardtillery" addresses was received in the corresponding mailboxes just as before; however, all *outgoing* mail was sent from addresses ending "@leonardsciolla.com."  Upon Tillery's request, email sent to "ktillery@leonardtillery.com" was

4

initially forwarded to his new email address at the Pepper, Hamilton law firm; later, email messages sent to either "ktillery@leonardtillery.com" or "ktillery@leonardsciolla.com" triggered an automatic response, originating from the address "ktillery@leonardsciolla.com," which read: "M. Kelly Tillery, Esquire is no longer available at this address. He can be reached at <tilleryk@pepperlaw.com>." Exs. D-1, P-14; 3/23/06 Tr. 69-70, 72-74, 76-77, 85-87. (Emails sent to any other address ending with "@leonardtillery.com" did not trigger an automatic response. 3/27/06 Tr. at 112-13.)

Tillery made an effort to inform his existing clients and contacts of his new association. On June 8, 2005, his new assistant sent an email on his behalf to approximately 415 people to inform them of Tillery's career move. Ex. D-4; 3/23/06 Tr. at 78-79. Tillery testified this was "one of many" notices he had sent with this information. 3/23/06 Tr. at 79.

Tillery alleges that on April 27, 2005, he sent email messages to all Firm partners asking that they immediately stop using his name and likeness, including the domain name "leonardtillery.com", and made the same demand through counsel on October 7, 2005. He alleges he received no response.

By letter of March 29, 2006, the Firm informed the court it had made a change to the page found at the address "www.leonardtillery.com." As of that date, a user typing (or following a link to) that address would no longer be "seamlessly" directed to "www.leonardsciolla.com." Instead, an "interim" page was created to alert the user to the redirection. Now, if a user accesses "www.leonardtillery.com," the following message appears: "Leonard & Sciolla, LLP was formerly known as Leonard, Tillery & Sciolla, LLP. **Mr. Tillery is no longer associated with the firm.** If you are not automatically redirected to the Leonard & Sciolla web site, click here."

(Emphasis in original.)  Within a few seconds, the user is redirected to the address

"www.leonardsciolla.com" and the Firm's new web site.


## II. DISCUSSION

When deciding a motion for a preliminary injunction, the court must consider: (1) the

likelihood that the moving party will succeed on the merits of its claim; (2) the extent to which

the plaintiff is being irreparably harmed by the conduct complained of; (3) the extent to which

the defendant will suffer irreparable harm if the preliminary injunction is issued; and (4) the

public interest.  *Opticians Ass'n of America v. Indep. Opticians of America*, 920 F.2d 187, 192

(3d Cir. 1990) (internal citations omitted).  A preliminary injunction will be granted "[o]nly if the

movant produces evidence sufficient to convince the trial judge that all four factors favor

preliminary relief should the injunction issue."  *Id.*


### A. Reasonable Probability of Success on the Merits

### 1. Federal Unfair Competition and Trademark Infringement

Tillery argues the Firm's use of the domain name "leonardtillery.com" constitutes unfair

competition and trademark infringement under Section 43(a) of the Lanham Act, 15 U.S.C. §

1125(a).[2]  In the Third Circuit, to prove either federal trademark infringement or unfair

---

[2] 15 U.S.C. § 1125 (a) provides:
(1) Any person who, on or in connection with any goods or services, or any container for
goods, uses in commerce any word, term, name, symbol, or device, or any combination
thereof, or any false designation of origin, false or misleading description of fact, or false
or misleading representation of fact, which--

(A) is likely to cause confusion, or to cause mistake, or to deceive as to the

competition under 15 U.S.C. § 1125(a)(1)(A), a plaintiff must demonstrate: (a) the mark is valid and legally protectable; (b) it owns the mark; and (c) the defendant's use of the mark to identify goods or services causes a likelihood of confusion.  *Opticians Ass'n of America*, 920 F.2d at192.

### (a) Valid and protectable mark

Tillery contends TILLERY "and variants thereof" are protectable marks in the nationwide market for intellectual property legal services.[3]  Personal names can serve as a trademark, but they are considered "descriptive," not inherently distinctive marks,[4] so they are treated as protectable trademarks only upon a showing of distinctiveness and secondary meaning.  2 *McCarthy on Trademarks and Unfair Competition,* Fourth Ed., § 13.2 (collecting cases).

Factors considered in determining whether a mark has developed secondary meaning include: (1) extent of sales and advertising leading to buyer association; (2) length of use; (3)

---

affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or
(B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities,
shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

[3] Tillery's proposed preliminary injunction order lists the following as protectable trademarks owned by Tillery: Tillery, Kelly Tillery, M. Kelly Tillery, Michael Kelly Tillery, and Michael Tillery.

[4] Trademarks protected under the Lanham Act fall under four categories: (1) arbitrary or fanciful marks bear no logical or suggestive relation to the actual characteristics of the goods; (2) suggestive marks require consumer imagination, thought or perception to determine what the product is; (3) descriptive terms forthwith convey an immediate idea of the ingredients, qualities or characteristics of the goods and (4) generic marks function as the common descriptive name of a product class.  *Checkpoint Systems*, 269 F.3d at 282 (internal citations omitted).

7

exclusivity of use; (4) fact of copying; (5) customer surveys; (6) customer testimony; (7) use of mark in trade journals; (8) size of company; (9) number of sales; (10) number of customers; and (11) actual confusion.  *Commerce Nat. Ins. Services, Inc. v. Commerce Ins. Agency, Inc.,* 214 F.3d 432 (3d Cir. 2000).

A personal name acquire secondary  meaning as a mark "when the name and the business become synonymous in the public mind" and the secondary meaning "submerges the primary meaning of the name as a word identifying a person, in favor of its meaning as a word identifying that business."  2 *McCarthy on Trademarks* 13.3 (internal citations omitted); *accord,  Paco Sport, Ltd. v. Paco Rabanne Perfumes*, 234 F.3d 1262 (2d Cir. 2000).  "Proof of secondary meaning entails vigorous evidentiary requirements. . . . The plaintiff must not only show that it used a personal  name as a trademark, but that a substantial portion of the consuming public associates [the name] specifically with [its] business." *Flynn v. AK Peters, Ltd.*, 377 F.3d 13, 20 (1st Cir. 2004) (internal citation omitted).  If the mark is primarily a personal  name, then the senior user must prove the existence of secondary  meaning in its mark at the time and place that the junior user first began use of that mark.  *Johnny Blastoff v. Los Angeles Rams Football Co. ,* 188 F.3d 427, 433-34 (7th Cir. 1999).

Although Tillery has used "Tillery"as his personal last name all his life, it does not appear from the record that it was ever used in connection with a business or a product except as part of the name of law firms with which he was associated since his third year of practice (*i.e.*, Leonard, Tillery & Davison and then Leonard, Tillery & Sciolla, LLP).  There is no evidence that he commanded a particularly large share of the market, or that he made substantial efforts to advertise his own legal services separately from the law firms'.  No customer surveys or

customer testimony are in evidence.  There is also no evidence that others tried to copy his

trademark by passing off their own legal services as "Tillery" legal services.  In contrast, Mr.

Leonard testified–and documents tended to show–that Mr. Tillery generated only a few new

client matters in the last 16 months of his association, and those were, almost without exception,

from referrals by others.  Evidently Tillery's name was not so well known that strangers sought

his services.

Tillery does not cite any precedent in which a court granted an individual professional

working within a professional firm trademark rights in his own name.  The case most closely

analogous to this, *Edmiston v. Jordan*, 98 Civ. 3928 (DLC), 1999 WL 1072492 (S.D.N.Y. Nov.

24, 1999), supports a contrary decision.  In *Edmiston*, an advertising executive, Mark M.

Edmiston, sued to prevent The Jordan, Edmiston Group, a business of which he was formerly a

stockholder, from using his name.  The validity of the mark had not been contested and was not

an issue before the court.  Assuming that "Edmiston" was a mark, the court found it weak

because Edmiston had "never used his surname as a trademark except when working with [The

Jordan, Edmiston Group]"; although he was well known in the industry, he had not used his

name as "a word or symbol in such a way that it identifies and distinguishes a *commercial

source*."  *Id.* at *5 (internal citations omitted; emphasis in original).   Similarly, Tillery has been

associated with a law firm for the vast majority of his professional career; he has not published

legal manuals, model pleadings, or any other products bearing his name as a mark separately

from a firm's name; and has advertised his services mostly in connection with a law firm.   *Cf.*

*Donoghue v. IBC/USA (Publications), Inc.*, 886 F.Supp. 947, 948-49, 953 (D. Mass. 1995) (the

plaintiff, a nationally known investment advisor, had established a secondary meaning in his

9

name; for many years he had published a well-known semi-monthly newsletter, a monthly audio cassette investment advisory service, and an online mutual fund tracking and analysis service, all under his name, written ten books on investment advice, given a large number of seminars; frequently appeared on television shows, and was a nationally syndicated financial columnist).

The recognition of individual lawyers' names as trademarks without a strong showing of secondary meaning could hinder the creation of new law firms (since, unlike other businesses, law firms are traditionally identified by personal names and not fanciful trade names) and the ability of individuals to practice law in their chosen field without changing their names.[5]   Tillery has cited no precedent granting trademark status to a lawyer's personal name, used only in connection with his individual legal services, and the court could find none.[6]

Tillery is not likely to show his name  has acquired a secondary meaning supporting the

---

[5] It is well established that an individual does not have an absolute right to use his name in business–*i.e.*, a person named Kelly Tillery does not have an absolute right to open a bar called "Kelly's" if "Kelly" is the existing trademark of a restaurant chain in the same market. *See* 2 *McCarthy on Trademarks and Unfair Competion,* Fourth Ed., § 13.8.  Nonetheless, there is a difference between forcing a junior user to give his business a different name than his own and making a professional choose between changing his name or his field of practice.

[6] The only trademark case involving legal services the court has been able to find is *Suisman, Shapiro, Wool, Brennan, Gray, & Greenberg, P.C. v. Suisman*, No. 3:04-CV-745 (JCH), 2006 WL 387289 (D.Conn. Feb. 15, 2006).  A law firm generally known by the name of its two founders successfully applied for an order enjoining the descendants of those founders from using a practically identical name to identify their newly created law firm.  The district court found that the names "Suisman, Shapiro" had acquired secondary meaning because they identified the plaintiff law firm in the mind of consumers of legal services in the local market.  In the case of a law firm, a name or combination of names can acquire a secondary meaning because it no longer designates the actual people who bear those names, but a separate entity that is the source of certain services.  This is not the case where the plaintiff is an individual lawyer whose mark does not designate an entity separate from himself.

grant of trademark rights.[7]

**(b) Ownership**

Tillery argues he owns the trademark "TILLERY."  In order to prove ownership, he must establish prior rights in the mark by use in commerce.  *Lucent Information Mgmt. v. Lucent Techs.*, 186 F.3d 311, 315 (3d Cir. 1999).   Tillery claims he was the senior user of the mark but implicitly licensed his law firms to use it while he was a partner.  He urges the court to decide this action by analogy with franchise arrangements, where the franchisee has the right to use the franchisor's mark only for the duration of the contract.  The Firm argues it is the rightful owner of the trademark "leonardtillery.com," which it first put into commercial use in 1994.   It contends the proper analogy is with a company owning a trademark similar to or based on a name (e.g., "Howard Johnson's"); if the person by that name (e.g., Howard Johnson) leaves, the departure has no bearing on the company's trademark rights.

Tillery became a named partner three years after he left law school.  It is doubtful that he had acquired trademark rights in his name by that time.  He has produced no evidence his name had acquired the required distinctiveness by 1998, when the domain name "leonardtillery.com" was registered.

The only known agreement between the parties, the Partnership Agreement, includes no

---

[7] Even if Tillery could establish distinctiveness and secondary meaning as to a mark, it is unlikely that he could claim TILLERY as his trademark.  Tillery appears to have followed the common practice of referring to himself by his full name and not just his surname.  Tillery states he "has been practicing law continuously since October 11, 1979 utilizing the name 'M.KELLY TILLERY' in the Commonwealth of Pennsylvania as well as in the State and Federal Courts of many other states . . . ."  Pl.'s Mot. for Expedited Discovery, Prelim. Injunction and Order to Show Cause at 4.   If Tillery can establish distinctiveness, he is most likely to establish it as to the name he actually used and uses: "M. Kelly Tillery."

statement about the use of Tillery's name except the paragraph providing for continued use *in the firm name* of the surname of "a withdrawn, retired or deceased partner unless the use is deemed to be a violation of the Code of Professional Responsibility or the withdrawn or expelled partner continues to practice law."    It is undisputed that the Firm stopped using Tillery's name in its name.  In order to show that the Firm's current use of his name in its domain name violates the Partnership Agreement, Tillery would need to show that it violates the Pennsylvania Rules of Professional Conduct, which replaced the Code of Professional Responsibility in 1988.  The current Rules do not clearly state whether this is a violation.[8]

On the record before it, the court cannot determine whether Tillery is the senior user of the marks in this case and, if he owned the mark "TILLERY" (or "M. KELLY TILLERY") by 1998, on what terms he licensed its use in marks other than the firm name absent his continued consent.

**(c) Likelihood of confusion**

Even if it Tillery could establish that he owns "TILLERY" or "M. KELLY TILLERY" as a protectable mark, he does not make a strong showing of likelihood of confusion.

---

[8]    Rule 7.5 of the Pennsylvania Rules of Professional Conduct, "Firm Names and Letterheads," provides: "If otherwise lawful a firm may use as, or continue to include in, its name, the name or names of one or more deceased or retired members of the firm or of a predecessor firm in a continuing line of succession."  The commentary adds:

> A firm may be designated by the names of all or some of its members . . . .  A lawyer or law firm may also be designated by a distinctive web site address or comparable professional designation. . . . [U]se of [trade] names in law practice is acceptable so long as it is not misleading. . . . [I]t is misleading to use the name of a lawyer not associated with the firm or a predecessor of the firm, or the name of a nonlawyer.

Penn. R. of Prof. Conduct (2006), Rule 7.5 & Explanatory Comment.   It is unclear whether the commentary suggests that "a distinctive web site address" should be treated in the same way as a name and subjected to the same rules or that a web site address can actually <u>be</u> the firm's name.

To prove likelihood of confusion, Tillery must show that consumers viewing the mark "leonardtillery.com" would probably assume that the service it represents is associated with the source of a different service identified by the mark TILLERY or M. KELLY TILLERY, i.e., with Tillery himself.[9]  *See Checkpoint Systems v. Check Point Software Tech.*, 269 F.3d 270, 280 (3d Cir. 2001).  In the Third Circuit, the likelihood of consumer confusion is generally evaluated by weighing the ten so-called *Lapp* factors:

> (1) the degree of similarity between the owner's mark and the alleged infringing mark; (2) the strength of the owner's mark; (3) the price of the goods and other factors indicative of the care and attention expected of consumers when making a purchase; (4) the length of time the defendant has used the mark without evidence of actual confusion arising; (5) the intent of the defendant in adopting the mark; (6) the evidence of actual confusion; (7) whether the goods, though not competing, are marketed through the same channels of trade and advertised through the same media; (8) the extent to which the targets of the parties' sales efforts are the same; (9) the relationship of the goods in the minds of consumers because of the similarity of function; (10) other facts suggesting that the consuming public might expect the prior owner to manufacture a product in the defendant's market, or that he is likely to expand into that market.

*Interspace Corp. v. Lapp, Inc.*, 721 F.2d 460, 463 (3d Cir. 1983).  "Not all factors must be given equal weight.  The weight given to each factor in the overall picture, as well as the weighing for plaintiff or defendant, must be done on an individual fact-specific basis."  *Checkpoint Systems*, 269 F.3d at 280 (internal citations omitted).  "[W]hen products directly compete, mark similarity

---

[9] In comparing marks, the ".com" can be disregarded.  *See Brookfield*, 174 F.3d at 1055.

may be the most important of the ten factors in *Lapp*."  *Id.* at 281 (internal citations omitted).

The analysis of the *Lapp* factors follows.

i. <u>Similarity.</u>  The first and most important *Lapp* factor is similarity between the marks.
Contrary to Tillery's puzzling contention that the marks are identical,  TILLERY (or M.KELLY
TILLERY) and "leonardtillery.com" are only slightly similar; they share what might be perceived
as one element of a compound name.

ii. <u>Strength.</u>  A strong trademark "carries widespread, immediate recognition that one
producer . . . is associated with the mark, and so with the product. . . .  The strength of a mark is
determined by (1) the distinctiveness or conceptual strength of the mark and (2) its commercial
strength or marketplace recognition."  *Checkpoint Systems*, 269 F.3d at 282 (internal citations
omitted).  Personal names are generally considered descriptive and not inherently strong.  If a last
name used as a mark is a common last name, or used by a large number of third parties, it is
weak.  *Brennan's, Inc. v. Brennan's Restaurant, L.L.C.*, 360 F.3d 125, 132 (2d Cir. 2004);  *IDV
North America, Inc. v. S & M Brands, Inc.*, 26 F. Supp. 815, 823 (E.D. Va. 1998)   Tillery
testified "many of [his] relatives" are lawyers sharing the same name, but none is an intellectual
property lawyer and, to his knowledge, there is no other intellectual property lawyer named
Tillery "on the planet."  3/23/06 Tr. at 64.  As to the commercial strength of the mark, the inquiry
is limited to "the strength of the mark in the industry in which infringement is alleged."
*Checkpoint Systems*, 269 F.3d at 284.

It is unclear how common "Tillery" is as a name.  As to its commercial distinctiveness,
the parties have stipulated that Tillery is a well known intellectual property lawyer, and the name
does not appear to be used by a large number of competitors in the intellectual property legal

services market.  But assuming Tillery has a trademark in his name, it is unclear whether he has extensively used it as a mark independently of a law firm's name.  *See Edmiston*, 1999 WL 1072492, at *3 (personal name of advertising executive was a weak mark since he had "never used his surname as a trademark except when working with" a firm whose name included his surname.)  The record is inconclusive at this point as to the strength of Tillery's claimed mark.

   iii.  <u>Price of the services and other factors indicative of care and attention</u>. Where "the relevant products are expensive, or the buyer class consists of sophisticated or professional purchasers," the likelihood of confusion is less.  *Checkpoint Services*, 269 F.3d at 284. Although no evidence of rates was presented, the court takes judicial notice of the substantial cost of legal services by partners of Philadelphia law firms who specialize in intellectual property law.  There is evidence in the record that the vast majority of Tillery's clients are not unsophisticated individual consumers of legal services, but companies; in the sixteen months before Tillery left the Firm, the billing information for new matters opened listed high-level administrators or general counsel of the client company in every case but one.[10]  Consumers of intellectual property legal services can be expected to exercise a great deal of care when making a purchasing decision.

   iv.  <u>Length of defendant's use of mark without evidence of confusion</u>.  The Firm has used

----

[10] When the purchasing class is mixed, courts do not impose a heightened standard of care.  *Checkpoint Systems*, 269 F.3d at 285.  The only individual purchaser of Tillery's legal services identified in the record is a professional photographer.  It is not clear whether such a user should be considered unsophisticated in the field of intellectual property legal services.  Even if he is, the cost of the services would suggest exercise of care.

the mark since Tillery's departure about one year ago without any evidence of confusion.[11]

v. Intent of the defendant adopting the mark.  A defendant's intentional use of another's mark to cause confusion weighs in favor of finding likelihood of confusion. *Checkpoint Systems*, 269 F.3d at 286.  The mark was originally adopted with Tillery's approval.   There is no evidence that the Firm has refused to disable the domain name to capitalize on Tillery's renown; it claims it maintains it solely for the convenience of its existing clients and contacts.

The continued appearance in the source code of  the Firm's home page of the name "Tillery" as part of the phrase "Leonard Tillery & Sciolla locations" is troubling.  Testimony at the hearing on the preliminary injunction suggested this could easily be corrected; it is not clear why it has not been. *See* 3/27/06 Tr. at 28-29.  Tillery testified that the continued use of his name in the source code would cause internet search engines such as Google to find the Firm's web page when a user searched for "Tillery," but he admitted he is not an expert in web site design or in the functioning of search engines.[12]  The single use of the word "Tillery" in the source code is not persuasive evidence of deceitful intent.[13]

It is not clear whether Tillery argues that the Firm's failure to delete pages including his

_____

[11]  The domain name was registered in1998, but the relevant period starts on May 1, 2005, upon Tillery's departure.

[12] The Ninth Circuit Court of Appeals has described the working of search engines as follows:
When a keyword is entered, the search engine processes it through a self-created index of web sites to generate a . . . list relating to the entered keyword. . . .  The more often a term appears . . . in the text of [a] web page, the more likely it is that the web page will be "hit" in a search for that keyword and the higher on the list of 'hits' the web page will appear."
*Brookfield Commc'ns, Inc. v. West Coast Entm't Corp.*, 174 F.3d 1036, 1045 (9th Cir. 1999). *Id.*

[13] Because of the technical nature of this case, a computer expert will be appointed at trial.

picture and biography (rather than just disable the link to them), so that they appear as archival, cached pages in certain searches, is a sign of willful deception.  The Firm credibly asserted it was unaware of the issue until this litigation, and took immediate action to correct it.  There was no evidence of deceitful intent.

  vi.  <u>Evidence of actual confusion.</u>  It is not clear from the pleadings whether Tillery is claiming post-sale or initial interest confusion, *i.e.*, whether he argues that the Firm's use of the domain name might cause consumers to purchase intellectual property legal services from the Firm in the belief that the services are provided by Tillery or that consumers will be steered to the Firm's web site and, once there, decide to purchase Leonard & Sciolla services even though they realize they are not purchasing Tillery services.[14]   There is no evidence of either kind of

---

  [14] In "initial interest" confusion, a consumer does not actually make a mistaken purchasing decision on the basis of mark confusion; rather, the confusion initially directs him to the defendant's product, but he is aware by the time of purchase that it is not the product he was initially looking for.  *Checkpoint Systems*, 269 F.3d at 292-295.   A consumer looking for "Tillery" on the Internet may find the domain "leonardtillery.com" on a search engine such as Google, follow that domain to the Firm's web site, and once there, purchase intellectual property law services from the firm even after learning that Tillery is no longer a member of the firm.

  The Third Circuit Court of Appeals has not decided whether initial interest confusion may be caused by a confusing domain name.  Other circuit courts have held that it may.  *See PACCAR, Inc. v. TeleScan Techs., L.L.C.*, 319 F.3d 243 (6th Cir. 2003) (defendant's use of plaintiff's registered marks in numerous domain name combinations enjoined); *Promatek Indus., Ltd. v. Equitrac Corp.,* 303 F.3d 808, 812-13 (7th Cir. 2002) (affirming preliminary injunction against Equitrac's use of Promatek's mark on Equitrac web site).  Two courts in this District have held that initial interest confusion is less likely to be significant in the context of domain names, because "Internet surfers are inured to the false starts and excursions awaiting them" and will not be dissuaded from simply doing a new search if they initially arrive at the wrong web site. *Chatham Intl., Inc. v. Bodum, Inc.*, 157 F. Supp. 2d 549, 559 (E.D. Pa. 2001); *accord*, *Strick Corp.*, 162 F. Supp. 2d at 377.  These cases are only somewhat persuasive because the products involved there were not in direct competition.

confusion at this time.[15]

      vii, viii, ix, and x.  <u>Similarity in marketing and sales efforts; similarity of products in</u> <u>consumers' eyes; other factors suggesting the plaintiff may expand into defendant's market.</u> These factors are of limited relevance in this case.  Tillery and the Firm's services are in direct competition; it is assumed that they are marketed through the same channels and to the same target market.

      Even considering the facts as they were at the time of the complaint–with the address "www.leonardtillery.com" "seamlessly" connecting to the web page for the Firm– the *Lapp* factors do not clearly favor Tillery.  With respect to the web page at "www.leonardtillery.com," it is true that law firms are generally identified by the last names of certain partners, so a consumer could be misled into thinking that the law firm whose web site is accessed through the domain name "leonardtillery.com" provides Tillery's services; however, there is no evidence that sophisticated consumers in this market are likely to make a mistaken purchasing decision or to consider a different intellectual property lawyer from the one they were seeking simply because they accessed the wrong web site.  The likelihood of confusion is also lessened because both

---

[15] Evidence of actual confusion is not required to prove likelihood of confusion; because it is difficult to find, evidence of confusion may be highly probative of the likelihood of confusion.  *Checkpoint Systems*, 269 F.3d at 291.

    The court does not exclude the possibility that discovery might reveal instances of actual or initial interest confusion.  Discovery of the manner in which the Firm's acquired new business since Tillery's departure was not allowed at this stage.  The evidence in the record shows that most of the new matters opened by Tillery during his last 16 months at the firm involved potential clients referred to him from other clients or associates; it appears at least as likely that these potential clients would attempt to hire the attorney to whom they were referred even if their initial attempt to find him took them to the web site for other lawyers.  Tillery also testified that people important to him and his business know where to find him.  3/23/06 Tr. 80:23-24.  This group would presumably include individuals who refer clients to him.

Tillery and the Firm made a sustained effort to communicate the parting of their ways.  In addition, any likelihood of confusion *as to the item purchased* there may have been at the time this action was filed has now been substantially eliminated by the intermediate screen that appears at the address "www.leonardtillery.com"; it informs the user that Leonard, Tillery & Sciolla is no longer the name of the owner of the domain name and  Mr. Tillery has left the Firm.[16]

Tillery has also not shown a likelihood of confusion with respect to the Firm's continued use of email addresses ending with "@leonardtillery.com."  Email messages are generally directed to particular individuals.  Tillery's own emails were initially forwarded to him; later, they triggered an automatic return message with Tillery's new contact information.  ("M. Kelly Tillery, Esquire is no longer available at this address. He can be reached at <tilleryk@pepperlaw.com>.")  There is no evidence that the Firm read Tillery's incoming messages to capture potential business; would-be clients were instantly informed that Tillery had ended his affiliation with a firm and told how to contact him.  Tillery has requested the Firm to end this arrangement and to disconnect his email address; at the hearing on the preliminary injunction motion, Firm representatives agreed.  Under Tillery's preferred arrangement, a potential client writing to him will receive no response.[17]

---

[16] This change does not eliminate the possibility of *initial interest confusion,* because the screen announcing the change in firm name and Tillery's departure is not the "end of the line"; within a few seconds, the user is transferred to the Tillery & Sciolla web site.  *See* 3 *McCarthy on Trademarks* § 23.6 ("[a] disclaimer on an otherwise infringing web site does not remedy the initial interest confusion . . . caused by a confusingly similar domain name.")

[17] It is unclear whether Tillery contends that potential clients might write *another* lawyer at the Firm under the misapprehension that they will receive Tillery services.  If this is Tillery's argument, it is unpersuasive.  But because business email addresses are often based on the

19

**2. Pennsylvania Common Law Unfair Competition**

"Common law liability for unfair competition (which includes trademark infringement) is governed by local law. . . .  Federal law, however, serves as persuasive authority because, for many years, it governed these areas almost exclusively and spawned a large body of federal decisions." *Pennsylvania State Univ. v. Univ. Orthopedics, Ltd.*, 706 A.2d 863, 870 (Pa. Super. Ct.,1998). "The test for common law trademark infringement and unfair competition is essentially the same as the test for infringement and unfair competition under the Lanham Act." *Fisons Horticulture, Inc. v. Vigoro Indus.*, 30 F.3d 466, 472 (3d Cir.1994). *See also Limerick Auto Body, Inc. v. Limerick Collision Ctr.*, 769 A.2d 1175 (Pa. Super. Ct., 2001) (to prove common law trademark infringement, plaintiff must show that "he has a legal right to exclusive use of his trade name, that the defendant is using a trade name that is confusingly similar, and that defendant's use of the name is likely to cause confusion in the plaintiff's competitive area").

Tillery fails to establish a likelihood of success on his claim of Pennsylvania common law unfair competition for the reasons he fails to establish likelihood of success on the corresponding federal claim.

**3.  Anti-Cybersquatting Consumer  Protection  Act**

---

company's name, a person writing to an address ending in "@leonardtillery.com" may believe that the Firm's name is still "Leonard, Tillery & Sciolla" and that Tillery is still associated with it.  While there is no evidence at this point that this possible misapprehension will cause confusion as to the origin of particular legal services, it could be corrected by having messages to *all* email addresses ending with "@leonardtillery.com" trigger an automatic response with an announcement of the new Firm name and the new email address of the intended addressee (*i.e.*, "xyz@leonardsciolla.com").

Tillery contends that the Firm's continued use of "leonardtillery.com" violates the Anti-Cybersquatting Consumer Protection Act, 15 U.S.C. § 1125(d) ("ACPA"). The ACPA makes it illegal "for a person to register or to use with the bad faith intent to profit from an internet domain name that is identical or confusingly similar to the distinctive or famous trademark or Internet domain name of another person or company." *Shields v. Zuccarini*, 254 F.3d 476, 481 (3d Cir. 2001).

Even if Tillery owns the mark "TILLERY" and "leonardtillery.com" is confusingly similar, the evidence of bad faith use of the domain name is insufficient at this stage. Tillery has not proven a likelihood of success on this count.

### 4. False Advertising in Violation of 15 U.S.C. § 1125(a)

Liability for false advertising under the Lanham Act arises if the commercial message or statement is either (1) literally false or (2) literally true or ambiguous, but has the tendency to deceive consumers. *Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharms.*, 290 F.3d 578, 586 (3d Cir. 2002). Tillery's complaint alleges that the Firm's web site lists matters on which no lawyer presently at the Firm has worked or would be qualified to work. There is no impropriety in the Firm's listing on its web site matters on which Tillery worked while he was a partner at Leonard, Tillery & Sciolla, L.L.P.. At any rate, Tillery has introduced no evidence of the falsehood of the statements on the Firm's web site or their tendency to deceive the public; he has not shown a likelihood of success on the merits of this claim.

### 5.  Unauthorized Use of Tillery's Name in Violation of 42 Pa. C.S.A. § 8316.

42 Pa. C.S.A. § 8316(a) provides that "[a]ny natural person whose name or likeness has commercial value and is used for any commercial or advertising purpose without the written consent of such natural person . . . may bring an action to enjoin such unauthorized use and to recover damages for any loss or injury sustained by such use."

Because there is insufficient evidence that Tillery's name has "commercial value" and the terms of Tillery's consent to the use of his name in the domain name "leonardtillery.com" and the root email "@leonardtillery.com" are unclear, it appears unlikely at this stage that Tillery will succeed on the merits.

### B. Irreparable Harm to Tillery

A plaintiff seeking a preliminary injunction must show not only a likelihood of success on the merits, but also irreparable harm if an injunction does not issue. Irreparable harm is an injury that "cannot be redressed by a legal or equitable remedy following a trial." *Instant Air Freight Co. v. C.F. Air Freight*, 882 F.2d 797, 801 (3d Cir.1989). An irreparable injury is one that "is not remote or speculative, but actual and imminent and for which monetary damages cannot adequately compensate." *FMC Corp. v. Control Solutions, Inc.*, 369 F. Supp. 2d 539, 573 (E.D. Pa. 2005).

If "the plaintiff makes a strong showing of likely confusion [on a federal unfair competition claim], irreparable injury follows as a matter of course." *Opticians Assn.*, 920 F.2d at 196.[18]   Here, Tillery has not made a strong showing of likely confusion; irreparable harm is not

---

[18] The recent decision of the Supreme Court in *EBay Inc. v. MercExchange, L.L.C.*, 126 S.Ct. 1837 (2006), casts doubt on the continued validity of this principle.  In *EBay*, the Court held that the four-factor equity test for permanent injunctive relief applies to patent infringement

presumed.

Tillery admitted his practice has not been hurt, he has not lost clients, and there was no evidence that any client looking for him had engaged the Firm instead of him.   3/23/06 Tr. at 51.   Tillery also testified:  "My clients are pretty smart and able to find me by using the Web site by putting my name in to find me."  3/23/06 Tr. 80:23-24.

Mr. Leonard testified that in the nine matters involving new clients opened by Tillery in Tillery's last 16 months at Leonard, Tillery & Sciolla, the new client had been referred specifically to Tillery by an existing client or contact; there was no instance of a client looking for Tillery on the basis of his reputation.   3/23/06 Tr. 106-07.  This suggests that the likelihood of the Firm's capturing potential clients from Tillery is small.  Leonard also testified that the Firm's receptionist was instructed to provide Tillery's new business telephone number to any callers for Tillery.  3/23/06 Tr. 110-11.

Tillery has not presented any evidence that he could be harmed by the Firm's continued use of email addresses ending with "@leonardtillery.com,"    Email messages are generally directed at particular individuals.  Messages directed to Tillery at that email were initially forwarded to him, and later received an automatic response with Tillery's new contact information.  At Tillery's request, the messages now receive no response.  Tillery has not explained how he is irreparably harmed when a Leonard, Sciolla staff member receives an email message at an address ending with "@leonardtillery.com."

Finally, Tillery's motion for a preliminary injunction was filed almost three months after

---

cases as it does to other types of actions, including copyright infringement.  In any event, there is no need to apply *Opticians Association* here  because Tillery has not made the necessary showing.

his complaint in this action.  There is no evidence that Tillery will be irreparably harmed if the injunction does not issue.

**C. Irreparable Harm to Leonard & Sciolla**

The Firm argues that discontinuing all use of the domain name "leonardtillery.com" would cause it to lose email contact with individuals who still have or use the old email addresses and might also prevent potential clients, job applicants, and other associates from finding the firm on the Internet.  3/27/06 Tr. at 31 (email); 49-53 (web site).  It also claims that if it gave up its ownership of the domain name "leonardtillery.com," the domain name could be acquired by others. 3/27/06 Tr. at 6, 46-47.

The Firm introduced evidence that individuals who were informed of its change of name and contact information (including Mr. Leonard's brother,  the Firms's accountant, and a former client) sometimes attempted to contact Mr. Leonard and perhaps others at the Firm through the old email addresses with the "@leonardtillery.com"  root email.  3/23/06 Tr. at 99-103; Ex. D-17.  Mr. Leonard admitted these individuals would likely find the correct email if their initial attempt failed.  3/23/06 Tr. at 101-03.

Mr. Leonard did not know how many "hits" were registered on the domain name "leonardtillery.com" since May 1, 2005.   3/27/06 Tr. at 13.  He testified that the Firm received 25 "contacts," defined as e-mail messages generated through its web site, during the same period; he did not know how many of those contacts had originated from the "leonardtillery.com" domain name.  *Id.* at 14-16.

The Firm also introduced evidence that the first item found by searches for "Leonard &

24

Sciolla" on four different search engines was the Firm's web site at the "leonardtillery.com" domain name.  Ex. D-22, D-23, D-24, D-25.  Mr. Chaudry Tahir Manzoor, a computer consultant for the Firm, testified that if the domain name "leonardtillery.com" were disabled, the item found through those searches would be a "broken link" unable to connect the searcher to the current web site.  3/27/06 Tr. 50-51, 53.  Thus, a potential client looking for the Firm's web site through a search engine would not find it.  However, Manzoor conceded that an individual could type "www.leonardsciolla.com" in a web browser and find the web site.  *Id.* at 55.

Although the domain name, if disabled, could be acquired by others and escape the control of the Firm, Manzoor admitted that the Firm could retain the inactive domain name by paying a periodic fee.  3/27/06 Tr. at 57-58.

Leonard & Sciolla has not shown its damages would be great if an injunction were to issue, but it has shown it could incur some harm from the initial frustration of users locating the firm through a web search but unable to access the web site by link.

### *D. Public interest*

Where the plaintiff has not established that it is likely to prevail, the public interest does not favor an injunction that would disable a web site and disconnect a number of email addresses.

### III. CONCLUSION

Tillery has not established a likelihood of success on any of the five counts of his complaint; the balance of harm slightly favors the Firm; and the public interest would not benefit

from an injunction.  Tillery's motion for a preliminary injunction will be denied.  An appropriate

Order follows.

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **M. KELLY TILLERY** | : | **CIVIL ACTION** |
| | : | |
| **v.** | : | |
| | : | |
| **LEONARD & SCIOLLA, L.L.P.** | : | **NO. 05-6182** |

## ORDER

_____AND NOW, this 9th day of June, 2006, upon consideration of Plaintiff's Motion for

Preliminary Injunction and Expedited Discovery and Order to Show Cause, Defendant's Answer

thereto, and Defendant's Motion for Protective Order, following a hearing held on March 23 and

March 27, 2006, it appearing that:

a. This court has jurisdiction over the subject matter and the parties;

b. Venue lies in the Eastern District of Pennsylvania;

c. Tillery has not established  he is likely to succeed on the merits, the harm to him is

greater than the harm to the Firm or the public interest favors an injunction;

d. Further discovery will be permitted to clarify the issues.

It is **ORDERED** that:

1.  Plaintiff's  Plaintiff's Motion for Preliminary Injunction and Expedited Discovery and

Order to Show Cause (Paper # 8) is **DENIED.**

2.  Defendant's Motion for Protective Order (Paper # 11) is **DENIED**.


/s/ Norma L. Shapiro
                                                                          S.J.